## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FULL CIRCLE VILLAGEBROOK GP, LLC, an Illinois limited liability company,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>PROTECH 2004-D, LLC, an Ohio limited liability company, AMTAX HOLDINGS 436, LLC, an Ohio limited liability company, and ALDEN TORCH FINANCIAL LLC, a Delaware limited liability company,<br><br>　　　　　　　Defendants. | Case No:<br><br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff Full Circle Villagebrook GP, LLC (the "General Partner" or "Plaintiff"), for its Complaint against Defendants AMTAX Holdings 436, LLC ("Investor Limited Partner" or "ILP"), Protech 2004-D, LLC ("Special Limited Partner" or "SLP") (collectively, the ILP and SLP are referred to as the "Limited Partners"), and Alden Torch Financial LLC ("Alden Torch" and together with the Limited Partners, "Defendants") state and allege as follows:

## <u>INTRODUCTION</u>

1.　　In 2004, Villagebrook Apartments Limited Partnership (the "Partnership") was formed for the purpose of acquiring, constructing, rehabilitating, developing, repairing, improving, maintaining, and operating a 189-unit affordable housing development known as Villagebrook Apartments (the "Property").

2.　　The Property is located in Carol Stream, Illinois, and provides housing for low-income households pursuant to the restrictions set forth in the Low-Income Housing Tax Credit ("LIHTC") program (26 U.S.C. § 42 *et seq.* ("Section 42")), a federal Housing Assistance Payment

("HAP") contract, and a Regulatory Agreement with the Illinois Finance Authority (the "Finance Authority").

3.    The General Partner, Full Circle Holding, LLC ("Full Circle LP" and, together with the General Partner, "Full Circle"), SLP, and the ILP executed a Second Amended and Restated Agreement of Limited Partnership, dated effective as of May 1, 2005 (the "LPA"), providing for the operation of the Partnership.

4.    A true and correct copy of the LPA, inclusive of exhibits, is attached hereto as **Exhibit A**.

5.    Plaintiff is the general partner of the Partnership.

6.    Full Circle LP is the Other Limited Partner.

7.    Plaintiff and Full Circle LP are affiliates that share common ownership and control.

8.    AMTAX Holdings 436, LLC (the ILP) is the Investor Limited Partner of the Partnership.

9.    Alden Torch currently manages the ILP's interests in the Partnership.

10.    Protech 2004-D, LLC (the SLP) is the Special Limited Partner of the Partnership.

11.    Upon information and belief, Alden Torch acquired and currently owns 100% of the membership interests in the SLP.

12.    Alden Torch is known in the LIHTC industry as an "Aggregator" – an entity that acquires interests in affordable housing partnerships formed and operated in accordance with the LIHTC program, and then, upon the conclusion of the 15-year compliance period required by Section 42 (the "Compliance Period"), challenges the contractual transfer rights associated with those partnerships and attempts to extract value out of the interests that was not intended by the original parties to the partnership.

2

13.     If an Aggregator can force a cash return to the investor limited partner that was not intended by the original parties to the LIHTC deal, that cash return will, for the most part, go to the Aggregator.

14.     Aggregators, like Alden Torch, use a variety of methods to achieve their goal of extracting unintended value, such as forcing protracted litigation and leveraging economies of scale to, and in hopes of, overwhelming their counterparts.

15.     For more than fifteen years, and with Alden Torch being the sole exception, Full Circle and the Limited Partners operated pursuant to an agreement memorialized under the LPA that the Investor Limited Partner would receive the vast majority of tax credits allocated to the Partnership under the LIHTC program, as well as other tax benefits, over the course of the Compliance Period, and that the General Partner, or its assigns, have the right to purchase the Limited Partners' interests in the Partnership (the "LP Interests") following the conclusion of the Compliance Period (the "Option").

16.     The Investor Limited Partner has received all of the tax credits it expected to receive from the Property being operated in accordance with Section 42.

17.     The Compliance Period ended on December 31, 2019, after which the tax credits were no longer at risk of being recaptured by the IRS.

18.     The General Partner satisfied all conditions precedent to exercise its Option.

19.     On November 4, 2020, the General Partner duly exercised its Option.

20.     In relation to the Option exercise, the General Partner procured and provided Defendants with an appraisal of the LP Interests performed by Newmark Knight Frank ("NKF" and the "NKF Appraisal").

21.     Pursuant to the terms of the LPA, NKF's appraised value of the Property and the LP Interests is binding on the parties.

22.     The Limited Partners, under the management and control of Alden Torch, rejected the General Partner's valid and effective exercise of its Option.

23.     Alden Torch, through counsel, asserted that the LP Interests must be valued in a manner that conflicts with the express terms of the LPA and contradicts the intent of the original parties.  In particular, Alden Torch demanded the LP Interests be valued in a manner that takes into consideration the Limited Partners' capital account balances and is based upon a hypothetical liquidation of the Partnership as opposed to a hypothetical sale of the Partnership, as the LPA requires.

24.     The valuation method Alden Torch demands would yield a significantly larger cash payment to the Limited Partners under the Option, which would directly benefit Alden Torch and its affiliates to a significantly greater extent than the Limited Partners and otherwise conflict with the Limited Partners' best interests and objectives as tax credit investors seeking tax benefits.

25.     The General Partner brings this action seeking, among other things, to protect and enforce its rights and obtain, among other things, specific performance and damages because (i) the General Partner has validly and effectively exercised its Option to purchase the LP Interests under the express terms of the LPA, (ii) the Limited Partners are required to comply with the terms of the LPA (which were, to an extent, drafted by the Limited Partners), and (iii) the Limited Partners have refused to cooperate, because of Alden Torch's interference, with the General Partner's exercise and completion of its Option and rights attendant thereto.

**PARTIES**

26.     The General Partner is an Illinois corporation and is the sole general partner of the Partnership.  The General Partner's principal place of business is located at 310 South Peoria Street, Suite 500, Chicago, Illinois 60607.

27.     Defendant AMTAX Holdings 436, LLC (the ILP) is a limited liability company formed and existing under the laws of the State of Ohio, with its principal place of business at Alden Torch's business address in Denver Colorado.  Upon information and belief, none of the members of the ILP are citizens of the State of Illinois.

28.     Defendant Protech 2004-D, LLC (the SLP) is a limited liability company formed and existing under the laws of the State of Ohio, with its principal place of business at Alden Torch's business address in Denver Colorado.  Upon information and belief, Alden Torch, directly or through its affiliates, is the sole member of the SLP.

29.     Defendant Alden Torch is a limited liability company formed and existing under the laws of the State of Delaware, with its principal place of business in Denver, Colorado.  Upon information and belief, Alden Torch has four members, three of whom are citizens of the State of Colorado, and one of whom is a citizen of the Commonwealth of Massachusetts.

30.     Upon information and belief, Alden Torch currently manages the ILP's interests in the Partnership and claims entitlement to collect a percentage of any financial interest that the ILP may have in the Partnership.

**JURISDICTION, VENUE, AND CHOICE OF LAW**

31.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000 for the Plaintiff.  Specifically, Plaintiff is an Illinois Corporation with its headquarters in Illinois, and no Defendant is a citizen of Illinois.

32.     Jurisdiction and venue are proper in this Court because under Section 13.7.D(i)(A) of the LPA, the parties irrevocably agreed that any suit arising from the LPA can be brought in any United States District Court located in Illinois.

33.     This Court has personal jurisdiction over Alden Torch because, among other reasons, Alden Torch has regularly communicated with the General Partner in Illinois, manages the Limited Partners' interests in the Property, which is located in Illinois, has knowingly caused harm to an Illinois company as a direct result of its conduct, and otherwise routinely transacts business in and/or affecting Illinois.

34.     As manager of the ILP's interests in the Partnership and owner of 100% of the member interests in and obligations owed by the SLP, Alden Torch was aware of the LPA, which expressly provides for jurisdiction in this Court.

35.     Moreover, when Alden Torch was communicating and negotiating with the General Partner concerning the General Partner's exercise of its Option, Alden Torch knew its conduct would have an effect on the General Partner in Illinois, and also upon residents of Illinois who reside in the Property.

36.     Further, Alden Torch intentionally and tortiously interfered with the binding contract formed between the General Partner and the Limited Partners upon the General Partner's exercise of its rights under the Option, entitling the General Partner to purchase the Property at the designated purchase price pursuant to the terms of the Option.  In so doing, Alden Torch was acting in its own economic self-interest to maximize its cash return and secure benefits not provided for, or contemplated by, the LPA, the original parties that negotiated and entered into the LPA, or the binding contract that arose between the Limited Partners and the General Partner following the General Partner's exercise of the Option.

37.     In light of the foregoing, Alden Torch knew or should have anticipated that by interfering with the General Partner's rights under the Option and the subsequent, binding contract that arose following the General Partner's exercise of the Option, it would be subjecting itself to the jurisdiction of this Court.

38.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1).

39.     Pursuant to Section 13.4 of the LPA, the LPA shall be construed and enforced in accordance with the laws of the State of Illinois.

## ALLEGATIONS

### I.     The Low-Income Housing Tax Credit (LIHTC) Program

40.     The low-income housing tax credit ("Tax Credit") is a federal tax credit that is generated from certain multi-unit housing projects that satisfy a number of requirements, including, without limitation, an agreement by the property owner to only rent certain qualified units to households with incomes below certain qualified limits at rents that do not exceed certain federally-mandated maximums for a period of at least 15 years after the property is placed in service (the Compliance Period).

41.     The LIHTC program is governed by Section 42, certain Treasury Regulations, guidance from the United States Department of Treasury and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated housing agencies in each state (collectively, the "Tax Credit Rules").

42.     In many low-income housing projects, the project owner is organized as a limited partnership in which the managing general partner controls the day-to-day operations of the project, and a third-party tax credit investor is admitted as an investor limited partner, agreeing to contribute capital to the owner entity in exchange for an allocation of substantially all of the Tax Credits available to the project owner and certain other expected tax benefits.

43.     The Tax Credit Rules provide that only the project owner of a qualified low-income housing project can qualify for and receive Tax Credits, and only if the project owner meets certain terms and conditions and guarantees the continuation of these requirements for the duration of the Compliance Period.

44.     The project owner collects the Tax Credits over a ten-year period, but remains obligated to maintain the low-income rents during the fifteen-year Compliance Period.

45.     By the end of the Compliance Period, the project owner has collected all Tax Credits available to the project and other tax benefits.

46.     As a result, by the end of the Compliance Period, the investor limited partner has realized the vast majority of economic benefits it bargained for and expected from the project and further expects to exit the partnership near or following the expiration of the Compliance Period.

47.     A purchase option for the LIHTC property or the limited partner interests in the LIHTC partnership is often one of the primary economic incentives for the managing general partner in a low-income housing project.

48.     While the investor limited partner receives a substantial yearly return on its investment over ten years in the form of Tax Credits and other economic benefits, the managing general partner or an affiliate of it manages the project during the Compliance Period for fees, which are traditionally required to be deferred and paid out from project cash flows.

49.     The managing general partner, or an affiliate of it, and the individual members of the general partner are also the guarantors of the flow of Tax Credits, any negative adjustors, operating losses, project loans, and certain rental requirements, so the managing general partner, or its affiliate, and the individual members of the general partner assume significant risk in the LIHTC project.

50.     The managing general partner undertakes its investment of time, resources and money, as well as its duties and obligations, with the expectation that it will have the option and right to acquire the limited partner interests in the operation of the business as a going-concern or acquire the real estate itself at the end of the Compliance Period at a formulaic price.

51.     Commonly, and as is the case here, the investor limited partner does not expect, nor project, any cash payment at the exercise of the purchase option that includes, or even considers, the return of its capital contribution to the Partnership or related capital account balances.

52.     In this case, the General Partner invested in and took on considerable risk with the Partnership and dutifully served as the general partner of the Partnership with these aforementioned understandings and expectations.

53.     Without the Option and the parties' agreement that the formulaic price thereunder would not include, or even consider, the return of the Limited Partners' capital contributions to the Partnership or related capital account balances, the General Partner would have much less incentive to participate in, and otherwise would not have participated in, the development of the Property and operation of the Partnership.

54.     If the purchase price under the Option were to now include or consider the Limited Partners' capital contributions to the Partnership or related capital account balances, such would deprive the General Partner of a significant economic right to which the Limited Partners had agreed at inception.

## II.     Alden Torch is an Aggregator Within the LIHTC Industry

55.     Alden Torch is what is known throughout the LIHTC industry as an "Aggregator."

56.     For example, a report published in September 2019 found:

> Recently, however, a number of private firms have been challenging LIHTC project transfer rights across the country as a way of obtaining additional profit from these deals at the back end [*i.e.*,

after the 15-year compliance period closes]. These firms appear to be aggregating investor interests in LIHTC partnerships; asserting myriad claims and arguments against project transfers, including transfers to nonprofits; and extracting value from the project or nonprofit in the shadow of protracted litigation. As noted, some in the LIHTC industry have dubbed these firms "aggregators."

*Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance Commission, p. 5 (September 2019), http://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf (last visited April 7, 2020) (observing that firms like Alden Torch often use burdensome tactics, like litigation, to take advantage of resource disparities in order to leverage economies of scale in hopes of overwhelming their counterparts and preventing rights like the Purchase Options, as defined herein); *see also* Brandon Duong, *Losing Nonprofit Control of Tax Credit Housing?*, SHELTERFORCE, Oct. 16, 2020, https://shelterforce.org/2020/10/16/refusing-the-right-to-refuse/.

57. As a Florida Court recently found in a case involving Alden Torch's predecessor—Hunt Capital Partners, LLC ("Hunt")—the "Aggregators' playbook" involves "acquiring limited partner interests in LIHTC partnerships" and then "attempt[ing] to extract value out of such interests that were not intended by the original parties to the partnerships." *CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*, No. 23018-CA-013886-O, 2020 WL 6537072, *5, ¶¶33 (Fla. Cir. Ct. Nov. 3, 2020).

58. Alden Torch spun off of Hunt in 2015, acquiring a portion of Hunt's affordable housing platform through that spin off. Upon information and belief, Alden Torch's acquisition did not use liquidation values as concerns the purchase price attendant to the underlying interests owned in the affordable housing properties or partnerships in the housing platform.

59. Alden Torch claims to be the largest affordable housing asset management platform in the multifamily affordable housing industry, with $13 billion worth of assets under management.

60.     As such, Alden Torch's role as an Aggregator, known for conduct such as that giving rise to the dispute here, highlights a concerning trend in the affordable housing industry, where ownership and/or management and control of the investor limited partner interests changes hands during the Compliance Period, with the new limited partner or manager of those interests seeking to undermine the purchase options agreed to by the original parties at or near the start of the fifteen-year Compliance Period to extract additional profits to the detriment of the general partner and underlying residents in the affordable housing communities.

61.     Alden Torch has made no capital investment in the Partnership or the Property.

## III.     The Property and the LPA

62.     In 2004, the Partnership was initially organized to acquire, construct, rehabilitate, develop, repair, improve, maintain, and operate the Property.

63.     The Property was to be acquired, developed, and operated in such a manner as to qualify for Tax Credits.

64.     Pursuant to the LPA, in 2005, the ILP and SLP were admitted to the Partnership as the investor limited partner and special limited partner, respectively, and Full Circle LP was admitted as the "other limited partner."

65.     The terms of the LPA set forth the various rights and obligations of the General Partner, Full Circle LP, and the Limited Partners.

66.     Section 7.4.J of the LPA defines the terms of the Option, and provides, in relevant part:

> Subject to compliance with Section 42 of the Code, or any successor provision, if then applicable, at any time following the end of the Compliance Period, the General Partner shall have the right to purchase (or cause an Affiliate to purchase) the [LP] Interests and, in the General Partner's discretion, the interests of the other limited partners in the Partnership (the "Non-Paramount Interests") for cash, based on the amount they would receive if the property were

sold at the fair market value (as of the date of the purchase and as determined below with a 4% brokerage fee and as otherwise determined herein), and the proceeds of such sale were applied in accordance with this Agreement.

67.     The Option provides the General Partner with the right to purchase the LP Interests following the end of the Compliance Period.

68.     Pursuant to the Option, the Limited Partners would assign the LP Interests to the General Partner at the closing of the transaction provided for under the Option, and the LP Interests would continue in existence.

69.     The General Partner's exercise of its Option does not and will not cause the *de facto* liquidation of the LP Interests.

70.     Thus, the Option contemplates a sale of the LP Interests outside of the partnership, *i.e.*, the Partnership's rights and interests are not impacted by the transfer of the LP Interests from the Limited Partners to the General Partner under the Option.

71.     The Option further provides that the purchase price for the LP Interests (the "Option Price") must be calculated based upon the distribution of proceeds from the hypothetical sale of the Property.

72.     Section 7.4.J provides the process by which the Property value and the Option Price shall be determined, the result of which is ***binding*** upon the parties:

> The General Partner shall select one appraiser from LaSalle Bank National Association's or Deutsche Bank Berkshire Mortgage's approved list.  This appraiser shall serve as the only appraiser and shall proceed to determine the fair market value for the Project and the Paramount Interests and, if applicable, the Non-Paramount Interests subject to the Value Parameters (defined below), which value ***shall be binding on the parties***.  If, however Deutsche Bank Berkshire Mortgage or LaSalle Bank National Association do not have an approved list, the General Partner may select an appraiser subject to the approval of the Investor Limited Partner, provided such approval shall not be unreasonably withheld.  Any appraiser shall have MAI or equivalent designation and be independent of the

parties hereto and their Affiliates. The appraiser shall determine the fair market value for the Project, as of the date of the exercise of the option (or such later date due to any delay authorized herein) and fully considering the effect of any legally-binding commitment applicable to the Project to rent to low-income individuals pursuant to the Project Documents and to maintain rents for such units below market levels pursuant to the Project Documents, and shall calculate net sales proceeds based on a 4% brokerage fee and appropriate closing prorations and costs ("Value Parameters") ***and such value shall be final and binding on the parties hereto***. The fees of the appraiser shall be paid by the Partnership.

[Emphasis added.]

73. The Partnership had not been dissolved and was not in liquidation on November 4, 2020, when the General Partner notified Defendants that it was exercising its Option to acquire the LP Interests.

74. The General Partners' purchase of the LP Interests pursuant to the Option will not cause a dissolution or liquidation of the Partnership.

75. Thus, the Option Price must be calculated based upon the distribution of proceeds received from the hypothetical sale of the Property in accordance with Section 6.2 of the LPA, which memorializes the original parties' agreement as to the order of priority for the distribution of proceeds from a sale of the Property "[p]rior to [d]issolution."

76. In particular, Section 6.2.B of the LPA applies to proceeds from a "Sale or Refinancing" that occurs pre-dissolution and provides, in relevant part, "any Capital Proceeds shall be distributed to and among the Partners in the following amounts and order of priority:"

> First, to the payment of all debts and liabilities of the Partnership excluding those owed to Partners, and to the establishment of any reserves reasonably necessary for contingent unmatured or unforeseen liabilities or obligations of the Partnership;

> Second, to the payment of the Asset Management Fee of such year and for previous years as to which the Asset Management fee has not been paid in full;

Third, to the payment of any outstanding Management Fee to the Management Agent (including, without limitation, any unpaid Subordinated Management Fee), and then to the Deferred Developer Fee, the deferred General Contractor Fee and then to the repayment of any Subordinated Loans of the General Partner or a Guarantor;

Fourth, in the event of a sale, a priority distribution to the Investor Limited Partner an amount equal to the sum of (i) all federal, state and local income taxes which would be payable by the Investor Limited Partner and its members as a result of the sale of the Project giving rise to such distribution (calculated as if the special allocations pursuant to Section 6.5T had not been made and the deductions resulting from the Incentive Management Fee have not been taken), less any refinancing proceeds (including release of any principal reserve fund under the Project Documents) previously distributed to the Investor Limited Partner and (ii) any tax liability incurred by the Investor Limited Partner and its members as a result of the receipt of the distribution described in subclause (i) of this Clause Fourth (collectively, "Exit Taxes"); and

Fifth, the balance, if any, shall be distributed as follows: ten percent (10%) to the Investor Limited Partner (less any Exit Taxes paid to the Investor Limited Partner pursuant to clause Fourth above) but not an amount less than zero; .01% to the Special Limited Partner; .01% to the General Partner; and 89.98% to the Other Limited Partner plus any Exit Taxes paid to the Investor Limited Partner pursuant to clause Fourth above to the extent such amount reduces the amount distributable to the Investor Limited Partner pursuant to this clause "Fifth".

77.     Pursuant to Section 6.2.B of the LPA, the Limited Partners are entitled to either their Exit Taxes or a combined 10.01% of any residual proceeds received from a hypothetical sale of the Property, whichever is greater.

78.     The partners' respective capital account balances are not considered under Section 6.2.B of the LPA.

79.     In addition, Section 4.3.E of the LPA provides, in relevant part:

[N]o Partner shall have the right to withdraw, or receive any return of, its Capital Contribution, except as specifically provided herein. Except as set forth in the Purchase Agreement, the General Partner shall have no personal liability for the repayment of the Capital Contribution of any Limited Partner.

14

80.     Thus, Section 4.3.E prohibits the Limited Partners from demanding payment of their capital account balances as part of the General Partner's exercise of its Option.

**IV.     The Current Dispute**

81.     The Compliance Period ended December 31, 2019.

82.     On November 4, 2020, in accordance with the terms and conditions of the LPA, the General Partner timely provided the Limited Partners, through Alden Torch, with notice that it was exercising the Option (the "Exercise Letter").

83.     A true and correct copy of the Exercise Letter is attached hereto as **Exhibit B**.

84.     Along with the Exercise Letter, the General Partner included a copy of the NKF Appraisal, which calculates the value of the LP Interests and is binding upon the parties.

85.     A true and correct copy of the NKF Appraisal is attached hereto as **Exhibit C**.

86.     NKF is a nationally recognized appraiser who was on the approved list of appraisers for both, LaSalle Bank National Association and Deutsche Bank Berkshire Mortgage.  *See* **Exhibit D**.

87.     In fact, NKF remains on the approved lists of appraisers for the successor entities to LaSalle Bank National Association and Deutsche Bank Berkshire Mortgage.  Indeed, NKF is on the appraiser list for Newmark Capital Markets, which is the successor entity to Deutsche Bank Berkshire Mortgage, and the appraiser list for Bank of America, which is the successor entity to LaSalle Bank National Association.  *See id.*

88.     NKF calculated the fair market value of the Property to be $14,100,000.

89.     NKF calculated the value of the LP Interests based upon a hypothetical sale of the Property at the fair market value to be $494,594.

90.     Both calculations are binding on the parties under the LPA.

91.     Thus, the Option Price is $494,594.

92.     Nevertheless, over a month later on December 9, 2020, Alden Torch, through its own counsel but purportedly on behalf of the Limited Partners, refused to accept the General Partner's exercise of its Option.  *See* **Exhibit E**.

93.     In its letter, Alden Torch expressly rejected NKF's valuations of the Property and the LP Interests, notwithstanding the fact that those valuations are binding on the Limited Partners under the LPA.  Alden Torch instead demanded a payment equal to the ILP's capital account balance of approximately $2,915,746.

94.     In fact, Alden Torch, while completely disregarding the terms of the LPA and the binding nature of the NKF Appraisal in an effort to extract a windfall under the Option contrary to the intent of the original parties (as memorialized under the LPA), informed the General Partner it had until December 14, 2020 to object to consummating its Option at Alden Torch's absurd $2,915,746 figure, otherwise "Alden Torch expects to close on the terms communicated in this letter on or before December 31, 2020."

95.     In addition to the parties being bound to NKF's $494,594 valuation of the LP Interests under the terms of the LPA, Alden Torch's criticisms of the NKF Appraisal are straight out of the "Aggregator's playbook" for demanding an egregious payout contrary to the express terms of the LPA.

96.     *First*, while Section 6.2.J of the LPA requires an appraiser determine the value of the Property under the Option, Alden Torch disagrees with NKF's valuation because it is below the purported value range of the Property based upon a broker's opinion of value Alden Torch solicited from CBRE.

97.     A broker's opinion of value is not the same as or interchangeable with an appraiser's appraised value.

16

98. The LPA contains no provision calling for a broker's opinion of value.

99. Thus, Alden Torch's criticism of the Property's appraised value under the NKF Appraisal based upon a broker's opinion of value conflicts with the express terms of the LPA.

100. **Second**, Alden Torch takes issue with NKF's valuation of the LP Interests, which was performed in accordance with the express terms of the LPA, including Section 6.2.B's order of priority for the distribution of sale proceeds when the Partnership is not being dissolved and liquidated. Alden Torch instead asserts the LP Interests must be valued pursuant to Section 6.3 of the LPA in accordance with a hypothetical liquidation of the Partnership, requiring the General Partner pay the ILP its capital account balance back under the Option Price.

101. Alden Torch contends that because an actual sale of the Property would trigger a dissolution and a liquidation of the Partnership, Section 6.2.B's application to pre-dissolution sale proceeds should be eviscerated and the LPA reformed so the hypothetical sale required under the Option instead requires a hypothetical liquidation of the Partnership.

102. Alden Torch's assertions contradict the express terms of the LPA, including, without limitation, Section 4.3.E and Section 6.2.B, particularly because neither the LP Interests nor the Partnership are being dissolved and liquidated under the Option.

103. Alden Torch's misplaced contention also ignores the express terms of Section 6.3.C, which reflects the original parties intent that even if the Partnership was being dissolved and liquidated (it is not), a distribution of Capital Proceeds under Section 6.3 that diverges from what would result from an application of Section 6.2.B would be considered a defect to be remedied.

104. Furthermore, the LPA does not provide a right to challenge the conclusions of the **binding** NKF Appraisal.

17

105. Despite being contractually required under the LPA to sell their Partnership interests to the General Partner upon the General Partner's proper exercise of the Option, the Limited Partners' position, by and through Alden Torch, not to do so breaches the LPA.

106. This course of conduct is a pattern replicated by Alden Torch—on behalf of itself, the Limited Partners here, and other limited partners—throughout the LIHTC industry in which it has inserted itself in recent years for the express purpose of depriving general partners and their affiliates from achieving the negotiated rights and benefits set-forth in their agreements with Alden Torch's predecessors.

107. Alden Torch's position is designed to extract a large cash payment from the General Partner after the end of the Compliance Period through the Option, rather than secure additional tax benefits for the Limited Partners, because it is in Alden Torch's own financial best interests to do so.

108. For example, if the Option Price included payment of capital account balances, the increased cash payment would benefit Alden Torch financially rather than, or more so, than the Limited Partners.

109. Alden Torch's clearly defined business practice prevents the transfer of the Limited Partners' interests in the Partnership to the General Partner after the end of the Compliance Period absent the General Partner's payment of an excessive Option Price not intended by the original parties to the LPA.

110. Alden Torch's ongoing business practice intentionally and tortiously interferes with the LPA by causing the Limited Partners to breach their obligations under the LPA in order to increase the financial benefits for Alden Torch and/or its affiliates to the detriment of the Limited Partners.

18

111.    Upon information and belief, Alden Torch's compensation is, in part, performance-based.

112.    Upon information and belief, Alden Torch is entitled to the vast majority of any cash payment made to the Limited Partners pursuant to the exercise of the Option, while the tax credit investors, who own nearly all of the ILP's equity interest would be entitled to the loss benefit associated with writing off any remaining costs basis for their original capital contribution under the exercise of the Option at the proper Option Price.

113.    Alden Torch's business practice is designed to maximize its own economic benefit by artificially and improperly inflating the cash required under the Option Price to the detriment of the General Partner and the Limited Partners, the latter of which bargained for tax credits and related tax benefits when they entered the Partnership, not for a large, residual cash distribution following the close of the Compliance Period.

114.    Alden Torch's business practice is pursued to the detriment of the Limited Partners, and its actions are not consistent with the conduct required by a supposed agent for an alleged principal.

115.    Alden Torch is not, because of its misconduct, entitled to hide behind an alleged agent/principal relationship or privilege to insulate itself from liability.

116.    Even if Alden Torch was advancing the Limited Partners' economic best interests, although it is not, its business practice is still causing the Limited Partners to breach the LPA by not transferring the LP Interests to the General Partner in accordance with the terms and conditions of the LPA upon the General Partner's valid exercise of its Option.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (Against the ILP and SLP)

117.    Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.

118.    The LPA is a valid and binding contract.

119.    The LPA includes the Option, for which the General Partner provided sufficient consideration.

120.    The General Partner unconditionally exercised its Option, creating a binding contract for the sale of the LP Interests to the General Partner at the Option Price determined under the NKF Appraisal.

121.    The NKF Appraisal is binding on the parties under the LPA.

122.    The Limited Partners are obligated under the LPA to facilitate the sale of the LP Interests to the General Partner upon the General Partner's exercise of the Option.

123.    The Limited Partners, as managed and controlled by Alden Torch, have failed to perform their contractual obligations to facilitate the sale of the LP Interests to the General Partner upon the General Partner's valid exercise of the Option, thus breaching the LPA.

124.    The Limited Partners, as managed and controlled by Alden Torch, have also breached the LPA by refusing to accept the binding valuations of the Property and the LP Interests under the NKF Appraisal.

125.    The Limited Partners, as managed and controlled by Alden Torch, have further breached the LPA by way of Alden Torch's demand for an objectively unreasonable Option Price, which values the LP Interests based upon a hypothetical liquidation of the Partnership, even though the Option requires a hypothetical sale of the Property only.

20

126.    As a result of the Limited Partners' breach of their obligations under the LPA, the General Partner has been injured.

127.    The General Partner is entitled to, among other things, an order for specific performance requiring the Limited Partners transfer the LP Interests to the General Partner at the Option Price in accordance with the terms of the Option under the LPA.

128.    The General Partner is also entitled to a damages award against the Limited Partners in an amount exceeding $75,000, the precise amount of which will be determined at trial.

**COUNT II**
**DECLARATORY JUDGMENT**
**735 ILCS § 5/2-701**
**(Against the ILP and SLP)**

129.    Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.

130.    An actual controversy exists as to the Limited Partners' contractual obligations to perform pursuant to the LPA.

131.    The LPA is a valid and binding contract.

132.    The LPA includes the Option, for which the General Partner provided sufficient consideration.

133.    The General Partner unconditionally exercised its Option, creating a binding contract for sale of the LP Interests to the General Partner at the Option Price.

134.    The Limited Partners are required by the LPA to facilitate the sale of the LP Interests upon the General Partner's exercise of the Option.

135.    The Limited Partners, as managed and controlled by Alden Torch, have breached their contractual obligation to facilitate the sale of the LP Interests to the General Partner upon the General Partner's exercise of the Option.

136.    Plaintiff is entitled to a declaration under 735 ILCS § 5/2-701 that:

    a.    The General Partner's exercise of its Option is valid and enforceable;

    b.    The NKF Appraisal is binding on the parties under the LPA;

    c.    NKF properly determined the Property's fair market value in accordance with the terms and conditions of the LPA and, therefore, NKF's appraised value of the Property is binding on the parties under the LPA;

    d.    NKF properly appraised the value of the LP Interests by calculating the amount the Limited Partners would receive pursuant to a hypothetical sale of the Property at the appraised fair market value, as opposed to a hypothetical liquidation of the Partnership and, therefore, NKF's appraised value of the LP Interests is binding on the parties under the LPA; and

    e.    The Limited Partners must promptly transfer the LP Interests to the General Partner pursuant to the Option for the appraised value of the LP Interests under the NKF Appraisal.

**COUNT III**
**TORTIOUS INTERFERENCE WITH THE LPA**
**(Against Alden Torch)**

137.    Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.

138.    The LPA is a valid and binding contract between the General Partner, Full Circle LP, and the Limited Partners.

139.    Prior to taking the actions described herein, Alden Torch was aware of the LPA and the Limited Partners' duties and obligations thereunder.

140.    Alden Torch, as owner/agent of the Limited Partners, has a material conflict of interest in the General Partner's exercise of the Option because Alden Torch stands to collect significantly more money if the Option Price is calculated by valuing the Limited Partners' interest in the Partnership based upon a hypothetical liquidation of the Partnership, as opposed to valuing

22

the LP Interests based upon a hypothetical sale of the Property outside of the liquidation context (as the LPA requires), and is therefore acting in its own economic self-interest to obstruct the General Partner's right to close on its Option, despite such actions being contrary to the best interests of the Limited Partners.

141.    Through its ownership of and control over the Limited Partners, Alden Torch has intentionally and unjustifiably caused the Limited Partners to breach their contractual obligations under the LPA by, among other things, refusing to accept the binding Option Price determined by the NKF Appraisal in direct conflict with the terms and conditions of the LPA, and thereby preventing the Limited Partners from facilitating the General Partner's exercise of the Option.

142.    As a result of Alden Torch's tortious interference with the LPA and the Limited Partners performance thereunder, the General Partner has been injured.

143.    The General Partner is entitled to a damages award against Alden Torch in an amount exceeding $75,000, the precise amount of which will be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    That the Court find that the Limited Partners have breached their contractual obligations under the LPA;

2.    That the Court order specific performance requiring the Limited Partners to transfer the LP Interests to the General Partner pursuant to the Option and in accordance with the terms and conditions of the LPA.

3.    That the Court find and declare that Plaintiff is entitled to a declaration under 735 ILCS § 5/2-701 that:

        a.    The General Partner's exercise of its Option is valid and enforceable;

b. The NKF Appraisal is binding on the parties under the LPA;

c. NKF properly determined the Property's fair market value in accordance with the terms and conditions of the LPA and, therefore, NKF's appraised value of the Property is binding on the parties under the LPA;

d. NKF properly appraised the value of the LP Interests by calculating the amount the Limited Partners would receive pursuant to a hypothetical sale of the Property at the appraised fair market value, as opposed to a hypothetical liquidation of the Partnership and, therefore, NKF's appraised value of the LP Interests is binding on the parties under the LPA; and

e. The Limited Partners must promptly transfer the LP Interests to the General Partner pursuant to the Option for the appraised value of the LP Interests under the NKF Appraisal.

4. That the Court award damages to the General Partner in an amount exceeding $75,000, the precise amount to be determined at trial.

5. That the Court order such other and further relief, including, without limitation, monetary relief and attorneys' fees and costs, which the Court may deem just, equitable and appropriate under the circumstances presented.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: December 23, 2020                    Respectfully submitted,


                                            */s/ Caitlin Martini Mika*
                                            Caitlin Martini Mika
                                            ARNOLD & PORTER
                                            70 West Madison Street, Suite 4200
                                            Chicago, Illinois 60602
                                            Tel: (312) 583-2300
                                            Caitlin.Mika@arnoldporter.com

                                            -and-

                                            David A. Davenport
                                            (*pro hac vice to be submitted*)
                                            Sean M. Zaroogian
                                            (*pro hac vice to be submitted*)
                                            WINTHROP & WEINSTINE, P.A.
                                            225 South Sixth Street
                                            Suite 3500
                                            Minneapolis, Minnesota 55402
                                            (612) 604-6400
                                            ddavenport@winthrop.com
                                            szaroogian@winthrop.com

                                            **Attorneys for Plaintiff**


20911447v4

**CERTIFICATE OF SERVICE**

On December 23, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Caitlin Martini Mika*
Attorney for Plaintiff