IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FULL CIRCLE VILLAGEBROOK GP, LLC, an Illinois limited liability company, | )<br>)<br>) |
| Plaintiff, | ) No. 20 C 7713 |
| v. | ) Judge Mary M. Rowland<br>) Magistrate Judge Finnegan |
| PROTECH 2004-D, LLC, an Ohio limited liability company, AMTAX HOLDINGS 436, LLC, an Ohio limited liability company, and ALDEN TORCH FINANCIAL LLC, a Delaware limited liability company, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## ORDER

Plaintiff Full Circle Villagebrook GP, LLC ("Full Circle" or "Plaintiff") has filed suit against Defendants Protech 2004-D, LLC ("Protech"), AMTAX Holdings 436, LLC ("AMTAX"), and Alden Torch Financial LLC ("Alden Torch") alleging that they have unlawfully refused to honor Plaintiff's option to purchase certain interests in a partnership set up pursuant to the Low-Income Housing Tax Credit ("LIHTC") program, 26 U.S.C. § 42 *et seq*. Currently before the Court is Plaintiff's renewed motion to compel production of documents responsive to several discovery requests. For the reasons set forth here, the motion is granted.

## BACKGROUND

### A.  The Partnership

The Villagebrook Apartments Limited Partnership (the "Partnership") was formed in 2004 for the purpose of "acquiring, constructing, rehabilitating, developing, repairing,

improving, maintaining, and operating a 189-unit affordable housing development known as Villagebrook Apartments (the "Property")" in Carol Stream, Illinois. (Doc. 1 ¶¶ 1, 2). The Property provides housing for low-income households pursuant to the restrictions set forth in the LIHTC program, a federal subsidy program designed to promote affordable rental housing projects. (*Id*. ¶ 2); *Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC*, 431 F. Supp. 3d 995, 997 (N.D. Ill. 2020) (Rowland, J.) (citing 26 U.S.C. § 42). The owners of qualified low-income housing projects like Villagebrook Apartments can claim tax credits "annually over a period of ten years, thereby offsetting their tax liability, but must continue to comply with rent affordability restrictions for a period of fifteen years, known as the compliance period, to avoid recapture of those credits." *Urban 8 Fox Lake Corp.*, 431 F. Supp. 3d at 997. *See also SunAmerica Housing Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872, 874 (6th Cir. 2022).

B.    **The Parties**

Plaintiff Full Circle is the general partner of the Partnership. Defendant AMTAX is the Investor Limited Partner ("ILP") of the Partnership. (Doc. 1 ¶ 8). The sole member of AMTAX is AMTAX Holdings Corporate Fund (Del.) Northeastern, LLC ("AMTAX Fund"). (Doc. 76-17, Alden Torch ROG Answers No. 10, at 20). Full Circle and AMTAX executed a Second Amended Limited Partnership Agreement (the "Partnership Agreement") effective May 1, 2005 providing for operation of the Partnership. (Doc. 1 ¶ 3; Doc. 1-1). Defendant Protech is the Special Limited Partner ("SLP") of the Partnership. (Doc. 1 ¶ 10).

Defendant Alden Torch is in the business of indirectly owning and/or managing entities that invest in LIHTC projects. (Doc. 79, Stein Decl., ¶ 2). In 2012, an entity called

Hunt Companies, Inc. ("Hunt") acquired a large portfolio of managing member interests in LIHTC funds (the "Capmark Portfolio") after Capmark Financial Group declared bankruptcy. (*Id*. ¶ 4). Hunt immediately assigned the Capmark Portfolio to HCP Pacific Asset Management, LLC ("HCP PAM") which was an Alden Torch affiliate and partially owned by Hunt. (*Id*. ¶¶ 2, 3, 4; Doc. 76-17, Alden Torch ROG Answers No. 6, at 17). This purchase is memorialized in a January 12, 2012 Order Approving Sale of Certain Subsequent Sale Assets Relating to Debtors' Low-Income Housing Tax Credit Business Free and Clear of All Liens, Encumbrances, Claims, and Interests." (Doc. 76-17, Alden Torch ROG Answers No. 6, at 17). The Capmark Portfolio included interests in limited partners of numerous separate LIHTC project partnerships, including AMTAX. (*Id*. at 18). In 2015, Alden Torch "acquired" HCP PAM and renamed it Alden Pacific Asset Management, LLC ("Alden PAM"). (Doc. 79, Stein Decl., ¶ 5).

After Alden Torch acquired the Capmark Portfolio, it became responsible for managing AMTAX's interests in Villagebrook Apartments Limited Partnership (the Partnership). It also owns 100% of the membership interests in Protech (the SLP). Plaintiff believes that Alden Torch is an "Aggregator" – an entity that "acquir[es] limited partner interests in LIHTC partnerships" and then "attempt[s] to extract value out of such interests that were not intended by the original parties to the partnerships." (Doc. 1 ¶ 57) (quoting *CED Capital Holdings 2000 EB, LLC v. CTCW Berkshire Club, L.L.C.*, No. 23018-CA-013886-O, 2020 WL 6537072, at *5 (Fla. Cir. Ct. Nov. 3, 2020)).

    C.    **The Upper Tier of the Partnership**

In the LIHTC industry, investor limited partner interests in multiple partnerships and properties are often pooled together in a tax credit "fund." (Doc. 76-1, at 8). The various

3

entities that own and control the tax credit fund are known as the "Upper Tier." (*Id*.).  The Upper Tier usually consists of 3 entities:

(1) an asset manager that controls and directs the limited partner of the LIHTC partnership interests;

(2) a single layer or multiple vertical layers of holding "funds" that own limited partner interests in multiple project partnerships; and

(3) the actual tax credit investor that invested the capital in the project partnerships (or its successor) in exchange for tax credits and other tax benefits.

(*Id*. at 8-9).  Here, Alden Torch is the asset manager.  There are two funds:  AMTAX Fund (the sole member of AMTAX) is the "Middle Tier Fund," and GMAC Guaranteed Northeastern Tax Credit Fund LLC ("GMAC") is the "Upper Tier Fund."  AMTAX Fund's managing member is Tax Credit Holdings III, LLC, which is wholly owned by Alden Pacific Holdings (which in turn is wholly owned by Alden Torch).  AMTAX Fund's non-managing member is GMAC.  (Doc. 76-17, Alden Torch ROG Answers No. 10, at 20-21)  Finally, the actual tax credit investor is New York Community Bancorp, Inc. ("NYCB").

### D. The Option and Plaintiff's Lawsuit

Section 7.4J of the Partnership Agreement between Full Circle and AMTAX states that "at any time following the end of the Compliance Period, the General Partner shall have the right to purchase . . . the [Limited Partners'] interests . . . for cash, based on the amount they would receive if the property were sold at the fair market value."  (Doc. 76-3, at 57).  Section 6.2B, titled "Distributions of Proceeds from a Sale or Refinancing," provides the method for determining the amount of cash the Limited Partners would receive from a sale of the Property.  (*Id*. at 47).  Specifically, the Limited Partners receive 10% of the residual value of the Property (gross proceeds from sale minus debts and

obligations), and the General Partner (Full Circle) gets 90% (more accurately, 10% goes to AMTAX, .01% goes to Protech, and 89.99% goes to Plaintiff).

On November 4, 2020, after the 15-year Compliance Period ended, Plaintiff exercised its Option and retained Newmark Knight Frank ("NKF") to determine the fair market value of the Property. NKF appraised the Property at $14.1 million. Based on the 10%-90% split under § 6.2B, Plaintiff says Defendants are entitled to $494,594. Defendants (AMTAX and Alden Torch) have declined to transfer the Limited Partner interests to Plaintiff, arguing that the proper calculation must be made under § 6.3 of the Partnership Agreement, entitled Liquidation. Under that provision, Defendants would receive $2,915,746. To resolve this dispute, Plaintiff filed the instant lawsuit charging AMTAX and Protech with breach of contract (Count I) and seeking a declaratory judgment against them (Count II). Plaintiff also alleges that Alden Torch tortiously interfered with its rights under the Partnership Agreement (Count III).

### E. Plaintiff's Discovery Requests

Plaintiff served its First Set of Requests for Production ("RFP") on January 12, 2022. (Doc. 76-6). Defendants responded initially on February 11, 2022 (Doc. 76-7), and following a meet and confer they served amended responses on March 9, 2022. (Doc. 76-9). Plaintiff believed the answers remained deficient and filed a motion to compel on March 12, 2022. (Doc. 59). Plaintiff also served a Second Set of RFPs on March 30, 2022. (Doc. 76-12). On April 13, 2022, this Court denied Plaintiff's motion to compel without prejudice based on the parties' representation that "it may be possible to further narrow and resolve the disputes." (Doc. 73). Shortly thereafter, on April 29, 2022, Defendants responded to Plaintiff's Second Set of RFPs. (Doc. 76-13).

Plaintiff has now filed a renewed motion to compel seeking two categories of documents that remain in dispute: (1) "economic expectation" documents; and (2) "Middle and Upper Tier" documents. Plaintiff argues that these documents are relevant to impeach Alden Torch's assertion that it is entitled to nearly $3 million upon exiting from the Partnership, and to establish that Alden Torch tortiously interfered with the Partnership Agreement between Plaintiff and the Limited Partners. (Doc. 76-1, at 4). Defendants insist that they have produced all economic expectation documents in their possession. They also object that the Middle and Upper Tier documents are irrelevant and, in any event, available from a more convenient and less burdensome source.

## **DISCUSSION**

Federal Rule of Civil Procedure 26(b)(1) allows parties to obtain discovery "regarding any nonprivileged matter that is relevant to a party's claim or defense and proportional to the needs of the case." *Motorola Solutions, Inc. v. Hytera Comms. Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019). *See also Arsberry v. Wexford Health Sources, Inc.*, No. 17 C 50044, 2021 WL 5232733, at *2 (N.D. Ill. Nov. 10, 2021). "The burden in a motion to compel rests with the party seeking discovery to explain why the opposing party's responses are inadequate." *MSTG, Inc. v. AT & T Mobility LLC*, No. 08 C 7411, 2011 WL 221771, at *6 (N.D. Ill. Jan. 20, 2011).

### A. Preliminary Arguments

Before addressing the parties' substantive arguments, the Court briefly considers two preliminary matters. First, Defendants note that only two requests at issue (23 and 28) are from the original First Set of RFPs, and the rest are from the Second Set of RFPs (54-69). Defendants object that there was no proper meet and confer on the Second Set

and suggest Plaintiff's motion is not ripe for review. (Doc. 78, at 1-2). Plaintiff responds that counsel for both parties "discussed, conceptually and in great detail, both categories of documents at issue multiple times in writing and in person," and says it is clear Defendants "have no intention of voluntarily producing the documents that are the subject of the Motion." (Doc. 85, at 13). Based on its review of the arguments raised in the parties' briefing, the Court finds that further meet and confer efforts would be futile and declines to deny the motion to compel on that basis.

The Court likewise rejects Plaintiff's assertion that all of Defendants' objections are "nothing more than boilerplate" and should be overruled for that reason. (Doc. 76-1, at 13). *See, e.g., Donald v. City of Chicago*, No. 20 C 6815, 2022 WL 621814, at *2 (N.D. Ill. Mar. 3, 2022) ("[U]nadorned, boilerplate objections are tantamount to no objections and operate as a waiver."). The parties' detailed discussion of Defendants' various objections belies Plaintiff's claim and the Court will not grant the motion to compel on that basis.

**B.     Economic Expectation Documents**

Turning to the substantive arguments, Plaintiff first seeks to compel production of documents responsive to the following RFPs:

> RFP 23 seeks: All underwriting and due diligence materials relating to the transaction through which Alden Torch invested in, acquired, or acquired an interest in AMTAX or AMTAX's managing member. The time period for this Request is January 1, 2012 through present. (Doc. 76-9, at 21).
>
> RFP 28 seeks: Documents sufficient to identify the projected or actual distribution of cash to AMTAX's members when/if cash is distributed to AMTAX from the Partnership (a) in the ordinary course of business, (b) upon the sale of AMTAX's interest in the Partnership, (c) upon the sale of the Property, and (d) upon a refinance of the Partnership's debt. (*Id*. at 24).

7

> RFP 54 seeks: All underwriting and due diligence materials relating to the Partnership or the entities that own, directly or indirectly, any interest in the Partnership available to Alden Torch at the time it invested in, acquired, or acquired an interest, directly or indirectly, in TCH, GMAC Guaranteed, AMTAX Northeastern or the Partnership.

(Doc. 76-13, at 9).

Plaintiff says these three requests cover "the economic expectations that existed when Alden Torch acquired its interests in the Partnership, through its ownership interests in the Middle and Upper Tier Funds." (Doc. 85, at 2). Plaintiff notes that Alden Torch's predecessor (Hunt) paid $102 million to purchase the Capmark Portfolio in 2012 and believes that before the purchase, Hunt "conducted due diligence, which will include projections of the economic returns it expected to receive from the acquisition, which will be derived from the partnership interests that are pooled into the 'funds.'" (Doc. 76-1, at 10). Plaintiff anticipates that the due diligence records "will contradict the litigation positions Alden Torch advances and demonstrate that the Limited Partner did not expect a large cash payment upon its exit from the Partnership." (*Id*. at 11).

Defendants first respond by going back to AMTAX's investment in the Partnership in 2005. According to Defendants, AMTAX expected to recoup its entire positive capital account (projected to be $3,219,106) when it exited from the Partnership in 2020. (Doc. 78, at 3). In support they cite a 109-page "Equity Investment Summary" prepared for the Limited Partners in 2005. (Doc. 80-7). Defendants have already produced the Equity Investment Summary and say this document reflects the position Defendants have taken in this litigation. (Doc. 78, at 7-8). Plaintiff disputes that the Equity Investment Summary is relevant, arguing that it "deals with projected tax consequences associated with projected capital account balances not the monetization of positive capital accounts as

argued and now sought by Alden Torch in violation of the Partnership Agreement." (Doc. 85, at 3) (emphasis omitted).

This Court need not resolve whether the Equity Investment Summary in fact supports Defendants' position because as Plaintiff points out, it is not seeking discovery regarding economic expectations when AMTAX first entered into the Partnership in 2005; to the contrary, Plaintiff confirms that those documents have already been produced. (Doc. 85, at 2). Instead, Plaintiff seeks documents generated around the 2012 acquisition of an interest in AMTAX. Defendants insist that they "do not possess and are unaware of any documents reflecting any expectations relied on or projected in acquiring the Limited Partners' interests in the Partnership." (Doc. 78, at 8). Plaintiff doubts this assertion, arguing that Alden Torch's predecessor (Hunt) would not have spent $102 million to purchase the Capmark Portfolio containing the managing member interests of the AMTAX Fund and the GMAC Fund without performing due diligence. (Doc. 76-1, at 11). Defendants respond that Hunt did no independent research and relied entirely on a "stalking horse" bidder that Capmark selected to conduct due diligence in advance of its bid and effectively create a market for the Capmark Portfolio. According to Defendants, Hunt assumed the stalking horse bidder had performed due diligence and used that as a benchmark for making its own, ultimately successful, bid. (Doc. 78, at 9-10).

In making this argument, Defendants rely solely on the declaration of Adam Stein, Senior Managing Director for Alden Torch, who merely states that "[o]n information and belief, Hunt assumed that the stalking horse bidder had performed due diligence on the Capmark Portfolio that was at least sufficient to support its opening bid." (Doc. 79, Stein Decl., ¶ 8). It is unclear why this statement was made on information and belief given

9

that Hunt is a predecessor of Alden Torch and Hunt immediately transferred the Portfolio to an Alden Torch entity upon purchase.

Notably, though Defendants repeatedly deny having "possession" of due diligence documents, they never claim to lack custody or control over records in the possession of their affiliates. "Courts analyzing a party's control of documents in the possession of a non-party affiliate look to several factors, including: (1) the party's and non-party's corporate structure; (2) the degree of ownership exercised by the parent over the subsidiary; (3) the financial relationship between the party and non-party; (4) the amount of overlap of directors, officers, and employees; and (5) the party's access to the non-party's documents in the ordinary course of business." *Wachovia Securities, LLC v. Loop Corp.*, No. 05 C 3788, 2008 WL 2625907, at *2 (N.D. Ill. June 27, 2008). Plaintiff argues that Alden Torch "is in control of the entirety of the Upper Tier and it otherwise controls any affiliates that holds responsive documents." (Doc. 76-1, at 16). According to Plaintiff: (1) Alden Torch and its affiliates are owned by one person, Alan Fair; (2) Alden Torch manages the Limited Partner interests in the Partnership; (3) Alden Torch manages all of the Upper Tier interests; and (4) Alden Torch stands to financially gain if it prevents Plaintiff's Option. (*Id.*). Defendants do not address this aspect of Plaintiff's motion or deny that they have control over documents within the possession of their affiliates.

Defendants argue instead that even if Hunt did perform due diligence or underwriting in connection with its acquisition of the managing member interests in the Capmark Portfolio, this due diligence "would not have related to the value of investor interests in that large portfolio of funds, most of which have no connection whatsoever to AMTAX, and certainly would not have valued AMTAX's interest in the Partnership, which

10

was just one of multiple interests held by a single fund in the portfolio." (Doc. 79, at 8-9). According to Defendants, any such documents are not relevant in determining the economic interests associated with the Partnership interests, and even if they were, Defendants do not possess any such documents. (*Id*. at 9).

Plaintiff responds that the underwriting and due diligence documents are relevant to (a) the enforcement of the Option and the proper methodology for calculating the Option price, which differs from the contractual interpretation Alden Torch has advanced in this litigation, and (b) Plaintiff's claim that Alden Torch is liable for "tortious interference for its attempt to generate unintended cash windfalls for its own pecuniary gain rather than the original tax credit investor that contributed capital to the Partnership." (Doc. 76-1, at 14). Citing certain documents it received from NYCB (the tax credit investor and part of the Upper Tier) pursuant to a subpoena, Plaintiff expects that "a more full production" of similar documents will impeach Defendants' contentions in this litigation. (Doc. 85, at 7).

Defendants seize on the fact that NYCB responded to a subpoena to argue that Plaintiff's motion to compel is moot and that there is no need for Defendants to produce additional documents. (Doc. 95, at 3). This Court disagrees. Plaintiff has made clear that NYCB "did not produce any underwriting and due diligence files, nor would it possess them because NYCB was not a party to the transaction to which the due diligence related." (Doc. 96, at 5) (emphasis omitted). In such circumstances, Defendants cannot rely on the NYCB production to avoid their discovery obligations under Rule 26. *Compare Federal Deposit Ins. Corp. for Valley Bank v. Crowe Horwath LLP*, No. 17 C 4384, 2018 WL 3105987, at *9 (N.D. Ill. June 25, 2018) (ordering the FDIC to conduct a relevancy review and produce responsive documents, except that no relevancy review was required

"[t]o the extent that a third-party has already produced, or has agreed to produce, all requested documents in response to [the defendant's] third-party subpoenas.").

Defendants must search for and produce due diligence and underwriting documents within their possession, custody, or control relating to the 2012 acquisition of the Capmark Portfolio as requested in RFP Nos. 23, 28, and 54. *See Boyd Group (U.S.), Inc. v. D'Orazio*, No. 14 C 7751, 2015 WL 5321262, at *3 (N.D. Ill. Sept. 11, 2015) (ordering production of documents that the defendant had "a legal right to obtain" from a third party). Plaintiff has made a reasonable argument that the documents are relevant and there is no indication that it would be unduly burdensome to produce them. In that regard, Plaintiff stresses that it has "only sought those due diligence documents that contain information related to the Partnership, the Limited Partner, or the Middle or Upper Tier Funds – *i.e.*, those documents that might relate to the Limited Partner interest at hand." (Doc. 76-1, at 14). To the extent Hunt relied on due diligence and underwriting documents prepared by the stalking horse bidder, Defendants also must produce such records within their possession, custody, or control. Plaintiff's motion to compel this category of documents is granted.

### C. Middle and Upper Tier Documents

RFP Nos. 55-69 collectively seek: (1) financial statements from January 1, 2019 to present for the Middle and Upper Tier Funds, which are controlled by Alden Torch; (2) operating agreements for the Middle and Upper Tier Funds and their managing member; and (3) documents evidencing any right held by Alden Torch or its subsidiaries to acquire the interest owned by the Limited Partner. (Doc. 76-1, at 11-12; Doc. 76-13, at 10-16). Plaintiff says these requests concern "the financial motive for the Aggregator [Alden

12

Torch] entering the Partnership and attempting to drive unintended cash to itself upon the limited partner's exit." (Doc. 76-1, at 4). More specifically, Plaintiff wants "Middle and Upper Tier" documents that Plaintiff believes "will show that Alden Torch's objection[s] to Plaintiff's Option are designed to create an unintended cash windfall for its own pecuniary benefit." (*Id*. at 12). Plaintiff explains that "the agreements that govern the various entities in the Upper Tier structure dictate how cash received by the Limited Partners from a sale of the Property is distributed to the members of the Upper Tier, *i.e.*, whether it goes to Alden Torch or its subsidiaries, or to the tax credit investor." (*Id*. at 9).

Defendants argue that the request for these documents is moot, again invoking the theory that since Plaintiff has already requested them through the subpoena to NYCB, requiring Defendants to produce them as well would be duplicative and unnecessary. (Doc. 78, at 11) (citing *Askew v. George Matick Chevrolet*, No. 16-CV-13148, 2019 WL 2714771, at *2 (E.D. Mich. Feb. 4, 2019)). Plaintiff says that NYCB produced only a small number of documents in response to the subpoena, and the production did not include "either of the operating agreements for the Upper and Middle Tier Funds, nor any financial statements for the period beginning January 1, 2019 to present." (Doc. 85, at 9). Once again, Defendants cannot rely on the NYCB production to avoid their discovery obligations under Rule 26.

Defendants also object that the discovery is irrelevant and disproportionate to the needs of the case. As to relevance, Plaintiff argues that like the underwriting and due diligence documents, the operating agreements and financial statements are relevant to (a) the enforcement of the Option and the proper methodology for calculating the Option price, and (b) Plaintiff's claim that Alden Torch is "liable for tortious interference for its

attempt to generate unintended cash windfalls for its own pecuniary gain rather than the original tax credit investor that contributed capital to the Partnership." (Doc. 76-1, at 14). Focusing on the second rationale, Defendants note that "[u]nder Illinois law," motive is not an element of a tortious interference claim. (Doc. 78, at 12) (citing *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018). In Defendants' view, evidence of whether Alden Torch would separately benefit from interfering with Plaintiff's Option is therefore only relevant in connection with Alden Torch's affirmative defense that its allegedly tortious actions were privileged because Alden Torch has an indirect ownership interest in the Limited Partners and is responsible for managing their interests. (Doc. 78, at 12) (citing *Nation v. American Capital, Ltd.*, 682 F.3d 648 (7th Cir. 2012)).

Plaintiff responds that even though motive is not an element of a tortious interference claim, it is still a factor to consider in determining whether interference was intentional and unjustified. (Doc. 85, at 10) (citing *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, at *10-11 (2021), citing Restatement (Second) of Torts § 767(b)) (noting that alleged self-serving behavior "perhaps would help the claim of tortious interference by illuminating 'the actor's motive.'"). Plaintiff also denies that a conditional privilege covering "the acts of corporate officers, directors, and shareholders undertaken on behalf of the corporation" protects Alden Torch from interfering with the Partnership Agreement in this case. (Doc. 85, at 10) (quoting *Nation*, 682 F.3d at 652).

The district judge will ultimately need to resolve these disputes and determine whether evidence of Alden Torch's motive is admissible in the case, and whether Alden Torch's interference was protected by a conditional privilege. For purposes of discovery, since motive may be relevant to Plaintiff's tortious interference claim, Defendants have

14

an obligation to produce the requested documents within their possession, custody, or control unless doing so would be unduly burdensome. Defendants' argument in that regard is very generic, consisting of the following statement: "responding to these Requests would entail the collection and review of many thousands of pages of documents, from nonparties, at a substantial cost to Defendants in staff and attorney time." (Doc. 78, at 13).

To begin, it is likely that the "nonparties" Defendants mention are Alden Torch affiliates. In addition, Plaintiff points out that quarterly financial statements for LIHTC funds "typically are single digits in page numbers, . . . while annual financial statements are slightly larger." (Doc. 85, at 11). In addition, "Upper Tier Fund operating agreements are unlikely to exceed the size of the Partnership Agreement, which is approximately 100 pages here." (*Id.*). By Plaintiff's estimate, it is seeking only about 35 documents. This is far less than the "thousands and thousands" of pages Defendants say are involved.

Despite the minimal evidence of burden, Defendants believe they should not have to produce the documents because they have come up with an alternative approach they deem "less burdensome" and "less expensive." (Doc. 78, at 14). Specifically, Defendants propose that they: (1) provide written interrogatory responses with the information Plaintiff seeks; (2) produce a Rule 30(b)(6) witness on these topics; and (3) provide a detailed account of the disposition of proceeds from Plaintiff's Option exercise. (Doc. 78, at 14-15). By way of a preview, Defendants state that, "[i]n brief, there are deferred asset management fees totaling $1,192,083.72 currently owed to Alden Torch's affiliate." (*Id.* at 14). "The Middle and Upper Tier Funds, however, currently have cash balances that are more than sufficient to pay the entirety of these deferred fees." (*Id.* at 14-15). As a

15

result, Defendants say the disposition of AMTAX's interest in the Partnership "will have no impact on whether and when an Alden Torch affiliate receives payment of these deferred fees." (*Id*. at 15). Finally, Defendants claim that an Alden Torch affiliate has an option to acquire NYCB's interest in the Upper Tier Fund, but "that option is not ripe, will likely never ripen, and has no connection to the disposition of AMTAX's interest in the Partnership." (*Id*.; Doc. 79, Stein Decl., ¶ 11).

Plaintiff objects that "lawyer-crafted interrogatories and scripted deposition answers" are no substitute for the production of the 35 or so documents. (Doc. 85, at 11). They note, for example, that though Defendants claim there are deferred management fees of over $1.1 million owed and there is sufficient cash to pay them, 2018 financial statements received from NYCB show only $32,582 in asset management fees and over $5 million in liabilities "due to affiliates." (*Id*. at 11-12). Other documents from NYCB also "suggest a different type of option exists, in addition to the one mentioned by Stein [to acquire NYCB's interest], and is an option for the investor member to force Alden Torch's affiliate to buy the investor member interests for $10,000, a right Alden Torch pushed the investor member to exercise in 2015." (*Id*. at 13). In response, Defendants have offered to provide Plaintiff with "documents sufficient to prove the assertions in Defendants' Opposition in exchange for Plaintiff withdrawing its pending Motion." (Doc. 95, at 2). This willingness to now produce at least some of the requested Middle and Upper Tier documents undermines Defendants' arguments as to relevance and burden.

In the Court's view, Defendants have not established that producing the requested documents, which are relevant to Plaintiff's case, will be overly burdensome. Nor is the Court satisfied that Defendants' compromise offer is a reasonable substitute for Plaintiff

16

having an opportunity to review the underlying documents for itself. Plaintiff's motion to compel documents responsive to RFP Nos. 55-69 is granted.

## CONCLUSION

For the reasons stated above, Plaintiff's Renewed Motion to Compel [76] is granted. Defendants are to produce responsive documents within their possession, custody, or control consistent with this opinion by July 13, 2022.

ENTER:

Dated: June 29, 2022

_____
SHEILA FINNEGAN
United States Magistrate Judge